IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

SEP 27 2005

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

MICHAEL W. GIBSON,     )
    Plaintiff,     )
                    )
                    )
v.                        )     Civil Action No. 1:04cv00057
                    )     **MEMORANDUM OPINION**
                    )
                    )
JO ANNE B. BARNHART,     )
**Commissioner of Social Security,**     )     By:   GLEN M. WILLIAMS
    Defendant.           )     Senior United States District Judge

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

The plaintiff, Michael W. Gibson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

-1-

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws,* 368 F.2d at 642).

The record shows that Gibson filed an application for SSI on December 20, 2000, alleging disability as of May 18, 1998, due to mental illness, migraine headaches, a back disorder, seizures, left shoulder pain and insomnia. (Record, ("R."), at 47-48, 50-63.) His claim was denied initially and on reconsideration. (R. at 24-28, 30-31.) Gibson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 32-33.) The ALJ held a hearing on October 24, 2001, during which Gibson was represented by counsel. (R. at 200-34.)

By decision dated April 11, 2002, the ALJ denied Gibson's claim. (R. at 12-17.) The ALJ found that Gibson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 17.) Furthermore, the ALJ determined that Gibson's alleged impairments of sleeplessness, a back disorder, seizures, left shoulder pain, a depressive disorder and migraine headaches were non-severe. (R. at 17.) The ALJ found that Gibson did not have any impairments that significantly limited his ability to perform basic work-related activities; therefore, Gibson did not have a severe impairment as defined by 20 C.F.R. § 416.921. (R. at 17.) As such, Gibson was not under a disability as defined by the Act at any time through the date of the decision and was not eligible for benefits. (R. at 17.) *See* 20 C.F.R. § 416.920(c) (2005).

After the ALJ issued his opinion, Gibson pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 4-6.) Gibson

then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment filed December 22, 2004, (Docket Item No. 16), and Gibson's Motion For Summary Judgment filed November 30, 2004. (Docket Item No. 14.)

## *II. Facts*

Gibson was born in 1973, (R. at 47), which classifies him as a younger person under 20 C.F.R. § 416.963(c) (2005). Gibson completed the ninth grade and obtained a general equivalency development diploma, ("GED"), in 2000, while incarcerated for forgery and uttery. (R. at 205, 211.) He had no relevant past work experience. (R. at 56.)

At his hearing, Gibson stated that his last position was with a temporary placement agency, which employed him as a laborer and sent him to various work sites. (R. at 212.) Gibson further testified that he had prior work experience with Hal Motor Apparel, Carolina Steel, fast food restaurants and as a rock quarry laborer. (R. at 212-14.) However, none of these jobs lasted more than six months. (R. at 223.) Gibson testified that he had not looked for work since his hospitalization following his father's and grandfather's deaths in May 1998, because it was hard to find jobs where he lived. (R. at 205-06.) Gibson testified that he had lived in both Roanoke and Floyd following his hospitalization, but mostly in Floyd, and his home in Floyd was "out in the country" and far from potential employment. (R. at 206-07.) When asked by his attorney what type of work he would have performed if he had lived in Roanoke, Gibson responded that he would have performed "steel work," but that he was no longer able to lift steel because of his shoulder injury. (R. at 207.) Gibson

also claimed that he had informal training as a mechanic and a steel worker but feared that if he tried to work as a welder he would do harm to himself. (R. at 224-25.)

When asked by the ALJ about his height and weight, Gibson responded that he was 5'10 and had weighed 323 pounds three months prior and could possibly weigh 350 pounds. (R. at 207.) Gibson attributed his weight gain to Neurontin, his anti-seizure medication, which he had been taking since May 1999. (R. at 207-08.) According to Gibson, he weighed between 225 and 250 pounds before starting this medicine and gained 100 pounds while taking the medication. (R. at 208.)

The ALJ next inquired about Gibson's jail sentence. (R. at 208.) Gibson explained that his family had noted his absence for four days, and then he was arrested three months later for forgery and uttery. (R. at 209.) Gibson testified that he was not taking his medication during this time period, and this was the last time he had experienced a seizure. (R. at 208-09.) Gibson indicated that his seizures were triggered when he was upset, but he was able to remain calm when he took his medication. (R. at 210.) Gibson further stated that he pleaded guilty to his charges and received a nine-month sentence, which he served in the county jail. (R. at 205, 209.) Gibson also testified that he had his driver's license suspended because of fines associated with his post-release court appearances. (R. at 209.)

When asked about his comprehension, Gibson testified that he had trouble with spelling and in understanding big words. (R. at 211.) Gibson also stated that he experienced such difficulty with adding and subtracting that his mother had to pay his bills. (R. at 211.)

-4-

Gibson was next asked to address his physical problems that prevented him from working. (R. at 213.) Gibson testified that he had suffered from back problems since working at Hal Motor Apparel. (R. at 213.) Gibson stated that he had previously twisted his back and then suffered a blow to his head, neck and back from a rock while working as a rock quarry laborer. (R. at 213.) Gibson testified that this injury forced him to miss three weeks of work, at the end of which he decided that he could no longer work in the rock quarry. (R. at 213-14.) Gibson stated that this decision was based on the fact that he suffered from migraines, which were aggravated by loud noise. (R. at 214.) Gibson testified that "after [he] got better," he worked in a fast food restaurant. (R. at 214.)

Gibson also described a car accident that had injured his left shoulder and required surgery. (R. at 214.) Gibson stated that he still suffered from numbness in his left shoulder, which prevented him from lifting objects. (R. at 214.) Although Gibson is right-handed, he pointed out that it was difficult to work without the use of both hands. (R. at 215.) Gibson denied any other physical problems besides his shoulder and back pain and added that his back kinked up after walking 20 to 30 feet. (R. at 215.) Gibson also stated that it bothered him to walk up steps because his weight placed pressure on his knees. (R. at 215.) Gibson further testified that sitting was difficult, as he was able to sit for about 10 minutes before he was required to stand. (R. at 215.)

Gibson also testified that he was depressed. (R. at 218.) He stated that he did not enjoy being around anyone and would get upset very easily. (R. at 218.) Gibson testified that he had been hospitalized for his nerves on several occasions. (R. at 219.) Gibson described one of these occasions and related that when he was 17, his parents

-5-

had sent him to the Lewis Gale Psychiatric Center because he had tried to kill his brother out of anger. (R. at 219.) He was placed in the children's wing for a month and given sleeping pills. (R. at 220.)

When asked about his daily routine, Gibson stated that he mainly tried to sleep because he was able to sleep only about three hours each night. (R. at 216.) Gibson indicated that he needed no help with self-care but was upset at having nothing to wear because of his weight gain. (R. at 218.) Gibson testified that he did not watch much television or do yard work or laundry but usually watched two action or horror movies a day, (R. at 220), and occasionally went outside, visited neighbors or friends, or called his grandmother. (R. at 216.) Gibson further testified that he sometimes went for rides with his mother in order to get out of the house. (R. at 219.) In elaborating on his sleep difficulty, Gibson mentioned that he regularly stayed up for days at a time because his mind would not rest even when his body was tired. (R. at 217.) Gibson stated that when this problem occurred, he wanted to do things but his body would not allow him. (R. at 217.) Even after such an episode, Gibson testified that he was able to sleep for only about six hours. (R. at 217.)

Gibson admitted that he did not have proper eating habits and had been eating only one meal a day for the past three months. (R. at 218.) Gibson stated that he feared getting burned in the kitchen, so he did not cook his own meals but had his mother prepare his meals. (R. at 218-19.) These meals consisted of Pizza Rolls and burritos because Gibson claimed that he could not stomach "good food." (R. at 222.) Gibson added that meat and vegetables, including mashed potatoes and green beans, made his stomach turn. (R. at 222-23.) Gibson lamented that he tried to avoid sweets but always craved them. (R. at 222.) Gibson further testified that he "[drank] a lot of drinks," in particular, soft drinks such as Mellow Yellow. (R. at 221-22.) He

-6-

estimated that he drank the equivalent of two 12-ounce cans of soda a day. (R. at 222.) Gibson also stated that he smoked two and a half packs of cigarettes a day. (R. at 221.)

Barry Friedman, Ph.D., an independent psychological expert, also testified at Gibson's hearing. (R. at 225-29.) Friedman testified that based solely on the record, Gibson did not have a disability that met or medically equaled the requirements of the listed impairments. (R. at 225.) Friedman reached the same conclusion basing his decision on both the record and Gibson's testimony to the extent that the record corroborated the testimony. (R. at 225-26.) Upon questioning from the ALJ as to any conclusions he had drawn based on the file and any observations, Friedman emphasized Dr. Gee's progress note from March 19, 2001. (R. at 226.) Friedman stated that this note indicates an individual who has an anti-social personality disorder and a major depressive disorder in remission but with a medication regime that was not aggressive for depression. (R. at 226.) Friedman testified that an anti-personality disorder diagnosis does not indicate a severe impairment but is simply a descriptive diagnosis that is made based upon a patient's history and behavior. (R. at 227.) Friedman explained that anti-social personality disorder individuals typically respond well in situations in which they decide they would like to respond well. (R. at 227.)

Friedman also expressed concern at the reliability of the therapy notes that are contained in the record. (R. at 228.) He stated that, often times, these notes contain subjective allegations from the patient that are used for treatment, but are not judged for credibility before written down and are not corroborated. (R. at 228.) Friedman found no other psychiatric or psychological diagnoses for Gibson, although he could not determine whether Gibson had an epileptic condition, since that was not his area of expertise. (R. at 226.)

Jean Hambrick, an independent vocational expert, was next to testify at Gibson's hearing. (R. at 229.) Hambrick testified that Gibson had no work history other than a generalized history of unskilled work, without any length of time in any one given occupation, and had no physical limitations but some limitations that caused friction or tension in the work place. (R. at 229-30.) Hambrick was asked to identify jobs that existed in significant numbers in the regional or national economies for an individual with Gibson's age, education and work experience who has no physical limitations, but who has limitations that are seen as causing friction or tension in the workplace. (R. at 230.) Hambrick listed the positions of cleaner, stock handler and equipment cleaner, which all fall at the medium and unskilled level. (R. at 230-31.) Hambrick stated that there were 61,000 available jobs for cleaners in the Virginia and West Virginia economies and 1,609,000 in the national economy. (R. at 231.) Hambrick testified that there were 22,800 open positions for stock handlers in the regional economy and 748,000 in the national economy, while there were 3,660 available positions for equipment cleaners in the regional economy and 134,000 in the national economy. (R. at 231.)

Hambrick stated that if such an individual also had an uncontrollable disruptive behavior, the behavior would not be generally tolerated in the workplace. (R. at 231.) Hambrick was next asked to consider an individual with Gibson's age, education and work experience with the limitations set forth in Dr. Gee's Medical Assessment Ability To Do Work-Related Activities, dated October 15, 2001. (R. at 232.) Hambrick stated that the job base would be eliminated for such an individual because of an inability to deal with co-workers or work stresses and to demonstrate reliability. (R. at 232.) Hambrick was next directed to the Mental Residual Functional Capacity Assessment of Hugh Tenison, Ph.D., dated March 16, 2001, and asked to consider the

effects on an individual with Gibson's age, education and work experience and limitations as indicated by the assessment. (R. at 232.) Hambrick testified that there were probably jobs at the simple, unskilled level for such an individual with moderate limitations; however, there was not enough detail in the assessment to accurately predict. (R. at 233.)

In rendering his decision, the ALJ reviewed medical records from Cumberland Mountain Community Services, ("Cumberland Mountain"); Dr. Edward Hunter, M.D.; Stone Mountain Health Services, Thompson Family Health Center, ("Stone Mountain"); Dr. Richard M. Surrusco, M.D., a state agency physician.; Howard Leizer, Ph.D., a state agency psychologist; Hugh Tenison, Ph.D., a state agency psychologist; and Dr. Jeffrey Gee, M.D.

Through a preadmission screening at Cumberland Mountain on September 8, 1998, that found that Gibson had not complied with outpatient treatment plans, Gibson was admitted to the Southwest Virginia Mental Health Institute, ("Southwest"), after being diagnosed with a borderline personality disorder, a major depressive disorder, nerve damage to his left shoulder and migraine headaches. (R. at 84-87.) The report notes that Gibson was expressing suicidal intentions. (R. at 85.) The report also notes that Gibson had a history of alcohol and drug use, including the use of LSD, mushrooms, crack cocaine and marijuana. (R. at 84.) The note further reflects that Gibson was admitted at Southwest under a court order. (R. at 87.) A progress note from Cumberland Mountain[1], dated September 11, 1998, documented that Gibson did not like being around others, and everything made him angry. (R. at 115.) The progress note also indicated that Gibson had burned his arm

---

[1]These progress notes show that Cumberland Mountain performed treatment while Gibson was at Southwest. (R. at 115.)

and cut himself after he punched a window. (R. at 115.) Gibson was advised that group counseling could be an outlet to express his anger, but Gibson felt uncomfortable with this idea. (R. at 115.) Cumberland Mountain then placed Gibson on day room restriction because he was potentially dangerous. (R. at 115.) Throughout the course of Gibson's stay at Southwest, Gibson's progress notes indicated that he regularly attended group counseling sessions and worked on addressing his anger. (R. at 105-14.) These progress notes showed an overall improvement in Gibson's condition, as it was documented that he appeared less depressed and was less aggressive and impulsive. (R. at 105-14) Cumberland Mountain attributed much of Gibson's rage to problems with his mother, which Gibson began to address during his stay. (R. at 105-14.) Southwest released Gibson on October 21, 1998. (R. at 105.)

On October 29, 1998, Cumberland Mountain saw Gibson after his discharge from Southwest on October 21, 1998, and he complained of his nerves and problems controlling his temper. (R. at 88-91.) He expressed a desire to obtain SSI and gave multiple excuses as to why he could not follow up on his treatment during the upcoming winter. (R. at 91.) Gibson also stated that he was uncertain about the amount of counseling to which he could commit. (R. at 91.)

Dr. Michael Friedman, M.D., a psychiatrist with Cumberland Mountain conducted a psychiatric evaluation on Gibson on November 5, 1998. (R. at 92-93.) He diagnosed Gibson with poly-substance dependence in early remission, a psychotic disorder, a major depressive disorder with severe psychotic features in remission and a mixed personality disorder. (R. at 93.) Dr. Friedman found that Depakote was successful in controlling Gibson's impulsivity and continued Gibson's use of Trazadone and Benadryl but decreased his dosage of Effexor. (R. at 93.)

-10-

Over the next two months, Gibson canceled several appointments with Cumberland Mountain and gave multiple excuses for failing to follow up with his treatment. (R. at 98-103.) Cumberland Mountain's last attempt to follow up with Gibson was by telephone on January 5, 1999, but Gibson was unavailable and his mother stated that Gibson was not following recommendations. (R. at 97.) Cumberland Mountain closed Gibson's case on February 24, 1999, due to his noncompliance with treatment and multiple excuses for missing several appointments. (R. at 94-95.)

On December 15, 2000, Gibson returned to Cumberland Mountain requesting treatment for bipolar disorder and reporting long periods of depression and anger. (R. at 96.) Gibson stated that he was still taking Effexor, Neurontin and Trazodone. (R. at 96.) He also completed an Assessment for Service Planning at Cumberland Mountain on December 21, 2000. (R. at 116-22.) He complained of symptoms of depression, irritability, insomnia, overeating and difficulty controlling his temper. (R. at 116.)

Dr. Jeffrey Gee, M.D., another psychiatrist with Cumberland Mountain, performed a psychiatric evaluation of Gibson on January 19, 2001. (R. at 124, 156.) Dr. Gee reported that Gibson suffered from a major depressive disorder and a anti-social personality disorder and continued Gibson's use of Trazodone, Vistaril and Neurontin. (R. at 124, 156.) Dr. Gee further noted that Gibson had good intentions to comply with his medical advice and that Gibson's main focus was to remain out of jail. (R. at 124, 156.)

-11-

Cumberland Mountain treated Gibson from January 2001 through March 2001. (R. at 153-55, 158.) During this period, Gibson complained of symptoms of depression, insomnia and a rash on his chest and scalp. (R. at 153-55, 158.) Gibson claimed that he was depressed because there was nothing to do and he did not know anyone. (R. at 155.) He gave many reasons as to why he could not pursue hobbies but stated that he was content to wait on SSI. (R. at 155.) Since Gibson's current medications caused increased drowsiness and the rash, Dr. Gee altered Gibson's medications on February 23, 2001, to increase his dosage of Vistaril and Neurontin and discontinue Effexor and Trazadone. (R. at 153.) On March 19, 2001, Dr. Gee noted that Gibson had very poor insight and made excuses when suggestions were made concerning his diet, activities and employment. (R. at 150.) Dr. Gee reported that he suspected Gibson's weight gain was the result of inactivity and an increase of calorie intake. (R. at 150.) While Dr. Gee believed Gibson was poorly motivated to change his situation and content to wait on SSI, he was hopeful that motivation and the desire to deal with his situation would come with time. (R. at 150.) Stone Mountain also treated Gibson during the early months of 2001, but no new diagnoses or changes in medication were made. (R. at 133-41.)

On March 5, 2001, Dr. Ed Hunter, M.D., conducted a medical consultative examination of Gibson. (R. at 125-32.) Dr. Hunter diagnosed Gibson with a psychiatric illness/anxiety but did not suspect any real physical impairments in Gibson's ability to sit, stand, walk, lift, carry, handle, travel, speak or hear, despite Gibson's complaints of physical limitations. (R. at 127-28.) An x-ray of Gibson's left shoulder showed no significant bony, soft tissue or joint abnormality. (R. at 129.) However, Dr. Hunter stated that Gibson was probably limited in his ability to understand, remember, sustain concentration and persistence, to interact socially and

-12-

to adapt.  (R. at 128.)

On March 16, 2001, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment for Gibson.  (R. at 142-49.)  Dr. Surrusco concluded that Gibson could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday.  (R. at 143.)  Dr. Surrusco assessed that Gibson was unlimited in his capacity to push and pull, other than as indicated for lifting and/or carrying.  (R. at 143.)  Dr. Surrusco formed his opinion after finding normal physical exams throughout Gibson's medical history and learning about Dr. Hunter's suspicion that Gibson had no real physical impairment.  (R. at 143.)  Dr. Surrusco found no postural, manipulative, visual or communicative limitations but determined that Gibson should avoid even moderate exposure to environmental hazards such as machinery and heights.  (R. at 146.)  Dr. Surrusco found no physical limitations, except those that were alcohol-induced, and determined that Gibson's complaints were not credible.  (R. at 147.)

On March 16, 2001, Hugh Tenison, Ph.D., a state agency psychologist, performed a Mental Residual Functional Capacity Assessment and completed a Psychiatric Review Technique form, ("PRTF"), on Gibson.  (R. at 159-62, 164-77.)  Tenison found that Gibson was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance and to be aware of normal hazards and

-13-

take appropriate precautions. (R. at 159-60.) Tenison found that Gibson was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances and to work in coordination with or proximity to others without being distracted by them. (R. at 159.) Tenison also found that Gibson was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain appropriate behavior and adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 160.) Tenison's findings were affirmed on April 10, 2001, by Howard Leizer, Ph.D., another state agency psychologist. (R. at 161.)

    In the PRTF, Tenison concluded that Gibson had an affective disorder, a personality disorder and a substance addiction disorder. (R. at 164.) He found that Gibson was moderately limited in activities of daily living and in maintaining social functioning but only moderately to mildly limited in maintaining concentration, persistence or pace. (R. at 174.) Tension found that Gibson was not limited by repeated episodes of decompensation. (R. at 174.) Tenison stated that Gibson's allegation of disability due to depression was not fully credible. (R. at 176.) Tenison also stated that while Gibson had some limitations, they would not preclude him from doing simple, unskilled work. (R. at 176.) The PRTF findings were affirmed on April 10, 2001, by Leizer. (R. at 161.)

On April 3, 2001, Cumberland Mountain again treated Gibson. (R. at 157, 196.) Gibson reported that even though he felt irritable at times, he felt more sociable and enjoyed creating drawings for his neighbors. (R. at 196.) Gibson stated that he was sleeping through the weeknights but staying up on the weekends to draw pictures. (R. at 157.) He also indicated that he had decreased his dosage of Neurontin, which worked better. (R. at 157.) Cumberland Mountain gave Gibson a month's supply of Vistaril. (R. at 157.)

On April 10, 2001, Dr. Surrusco completed a report, which stated that Gibson had a normal left shoulder and back x-ray. (R. at 163.) Dr. Surrusco also found that Gibson did not actually have seizures but "blackouts" when he failed to take his psychotropic medication. (R. at 163.) Dr. Surrusco further stated that he suspected no real physical impairments and that Gibson's allegations were not supported by the medical evidence and were not credible. (R. at 163.)

On June 11, 2001, Dr. Gee adjusted Gibson's medications again due to increased drowsiness and indicated that Gibson continued to make excuses as to why he could not work, look for a job or try to control his weight. (R. at 192.) On July 20, 2001, Gibson complained of a recent back injury that caused him problems ambulating. (R. at 195.) Gibson was advised to see his family physician, but he was unwilling to do so because he did not believe that a doctor could help his back problem. (R. at 195.) Gibson again offered excuses as to why he could not attend regular counseling. (R. at 195.)

On September 25, 2001, Cumberland Mountain reported that Gibson stated that

-15-

he was in compliance with his medical regimen; however, he still refused to participate in the clubhouse program. (R. at 188-89.)

On October 7, 2001, Gibson returned to Cumberland Mountain with excuses as to why he could not participate in treatment. (R. at 190.) Dr. Gee reported that Gibson was unwilling to make changes that were necessary to make him feel better and that Gibson offered constant excuses and expected others to do work for him. (R. at 190.) Dr. Gee also reported that he suspected an exaggeration of symptoms at times to appear "pitiful." (R. at 190.)

Dr. Gee completed a Medical Assessment of Ability To Do Work-Related Activities for Gibson on October 15, 2001. (R. at 198-99.) Dr. Gee indicated that in making occupational adjustments, Gibson was unlimited in his ability to follow work rules. (R. at 198.) Dr. Gee also found that Gibson had a satisfactory ability to use judgment, to function independently and to maintain attention/concentration. (R. at 198.) Dr. Gee found that Gibson had a seriously limited, but not precluded ability to deal with the public and interact with supervisors, while he had a poor or no ability to relate to co-workers and to deal with work stresses. (R. at 198.) Dr. Gee stated that Gibson's irritability and attitude affect the way that he dealt with stress and demanding situations. (R. at 198.) In evaluating Gibson's ability to make performance adjustments, Dr. Gee found that Gibson had an unlimited ability to understand, remember and carry out simple job instructions, and a very good ability to understand, remember and carry out detailed instructions and complex job instructions. (R. at 199.) Dr. Gee also determined that in making personal and social adjustments, Gibson had a satisfactory ability to maintain his personal appearance and to relate predictably in social situations, while Gibson had a poor or no ability to behave in an emotionally

-16-

stable manner or to demonstrate reliability. (R. at 199.) Dr. Gee found that Gibson could manage benefits in his own best interest. (R. at 199.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. §416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 11, 2002, the ALJ denied Gibson's claim. (R. at 12-17.)

-17-

The ALJ found that Gibson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 17.) Furthermore, the ALJ determined that Gibson's alleged impairments of sleeplessness, a back disorder, seizures, shoulder pain, a depressive disorder and migraine headaches were non-severe. (R. at 17.) The ALJ found that Gibson did not have any impairments that significantly limited his ability to perform basic work-related activities; therefore, Gibson did not have a severe impairment as defined by 20 C.F.R. § 416.921. (R. at 17.) As such, Gibson was not under a disability as defined by the Act at any time through the date of the decision and was not eligible for benefits. (R. at 17.) *See* 20 C.F.R. § 416.920(c).

Gibson argues that the ALJ erred in concluding that Gibson did not have a severe impairment. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3.) Gibson also argues that the ALJ failed to analyze the medical records and consider Gibson's testimony about the effects of his injury. (Plaintiff's Brief at 3.) Finally, Gibson argues that the ALJ failed to consider the combined effect of his impairments on his ability to work. (Plaintiff's Brief at 3.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that the decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-18-

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Gibson argues that the ALJ erred in finding that he did not suffer from a severe impairment. (Plaintiff's Brief at 3.) Unless an impairment is expected to result in death, it must have lasted or been expected to last for a continuous period of at least 12 months in order to render an individual disabled. *See* 20 C.F.R. § 416.909(b) (2005). Furthermore, the Social Security regulations define a "severe" impairment as an impairment that significantly limits a claimant's ability to do basic work activities. *See* C.F.R. § 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 416.921(b) (2005). The Fourth Circuit has held that "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler* 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

-19-

The court finds that substantial evidence supports the ALJ's finding that Gibson did not suffer from a severe physical impairment. Concerning Gibson's alleged physical impairments, the ALJ found that Gibson had not received any treatment or prescription medicine for his headaches but had taken over-the-counter drugs. (R. at 16.) The ALJ found that Gibson had received normal physicals and x-rays of his shoulder. (R. at 16, 129, 163.) The ALJ also noted that Gibson had not been treated for his back injury. (R. at 16, 195.) The record indicates that Gibson would not visit a doctor because he believed that a doctor could not help his back problem. (R. at 195.) The ALJ further found that Gibson did not suffer from seizures but "blackouts" and only when he failed to take his psychotropic medication. (R. at 16, 163.) Even Gibson admitted during his testimony that his "seizures" were caused by failing to take his medication and added that he had not experienced one since the time where he committed the uttery and forgery that led to his arrest. (R. at 208-09.) The ALJ's determination that Gibson did not suffer from a severe physical impairment is also supported by Dr. Hunter's and Dr. Surrusco's opinions that Gibson had no physical limitations, despite his complaints to the contrary. (R. at 127-28, 147.) Thus, the ALJ properly found that Gibson did not suffer from a severe physical impairment.

The court further finds that substantial evidence does not support the ALJ's finding that Gibson did not suffer from a severe mental impairment. Every psychiatrist, psychologist and social worker who evaluated or treated Gibson has stated that Gibson suffered from depression. Furthermore, every one of these mental health providers who have expressed an opinion on the issue has stated that Gibson's depression affected his work-related abilities. These work-related impairments were also confirmed by two state agency psychologists who reviewed the psychological

-20-

evidence of record. In fact, the record reflects that Gibson's depression was so severe that he was admitted to inpatient psychiatric treatment at Southwest under court order. Even Barry Friedman, the psychologist who testified at Gibson's hearing, recognized that Gibson had suffered from a major depressive order at one time, although he stated that he believed it was in remission by March 2001. That being the case, the court finds that substantial evidence does not exist in this record to support the ALJ's finding that Gibson did not suffer from a severe mental impairment.

Based on the court's finding that substantial evidence does not support the ALJ's finding that Gibson did not suffer from a severe mental impairment, it is not necessary to address Gibson's other arguments.

*IV. Conclusion*

For the foregoing reasons, I will overrule Gibson's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Gibson's claim for benefits to the Commissioner for further consideration. It is noted that there is evidence contained in this record to suggest that Gibson's mental impairment may be due to substance abuse. The Commissioner should address this issue on remand.

An appropriate order will be entered.

DATED:    This 27th day of September, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE